Columbia, November and December, 1869.

SAMUEL MORGAN AND OTHERS *vs.* W. J. KEENAN AND OTHERS.

An Act passed by the State, on the 21st December, 1861, entitled "An Act to charter a Cotton Planters' Loan Association," provided, *inter alia*, that the cotton of the associations (banking corporations based on cotton as their capital) should not be sold until six months after the removal of the then existing blockade of the coast; that their bills should then be redeemed in gold, and should, in the meantime, be received in payment of taxes and other dues to the State; and, also, (conditionally,) of so much of the war tax of the Confederate States as the State had assumed : *Held*, That these provisions did not make the Act null and void, as a measure passed in aid of the war then waged by South Carolina, with other States, against the Government of the United States.

Laws enacted for the advancement of the social, moral and industrial interests of the people, unconnected with the objects of the war, and not intended for its furtherance or support, were valid, though passed during the war by the Governments of the States composing the Southern Confederacy.

To render the Act void it should appear that it did, in itself, provide some resource, the tendency of which was, directly or indirectly, to extend to the Confederacy a facility of means by which its ability to carry on the war was increased.

The question is one not so much as to the construction of the Act in question as to the motive which induced its passage and the end intended to be accomplished; and as these are not apparent in its provisions, though testimony to prove them will not be received, yet history, showing the condition of the State, and the surrounding circumstances at the time, will be considered for that purpose. The inference, however, that such was the motive and the end designed to be accomplished, must be so strong that no other conclusion can be drawn.

BEFORE THOMAS, J., AT UNION, AUGUST TERM, 1869.

Appeal from the Circuit decree, which is as follows:

THOMAS, J. This is a bill filed by the billholders against the President and Directors and Stockholders of the Cotton Planters' Loan Association, of the Fifth Congressional District of South Carolina, incorporated under the Act of the General Assembly of the State of South Carolina, at its annual session for December, 1861.— 13 Stat., 45. The bills are in the nature of bank bills issued by this corporation, redeemable in gold six months after the raising of the blockade of our coast, and payable to bearer. They are predicated upon cotton subscribed by the stockholders, in accordance with the Act of incorporation.

The defendants have filed a demurrer to the bill, in which they allege that the bill should be dismissed, because the Act of 1861 "was in furtherance or support of the rebellion against the United States."

The law of the case has been established by the Supreme Court of the United States, in the late case reported in 7 Wallace, 700,

(*The State of Texas* vs. *White and others*,) where, on page 733, the rule is clearly laid down "that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of the citizens, and other acts of like nature, must, in general, be considered as invalid and void." The sole question in the case is, whether the Act of 1861 was in furtherance or support of rebellion against the United States.

Section 2 of the Act recites : " That any company, formed under the provisions of this Act, shall continue as a chartered company until the first day of January, one thousand eight hundred and sixty-five : *Provided,* That no company shall be formed after the removal of the blockade."

Section 4 recites : "And the President and Directors of each and every Association formed under this Act shall be authorized and empowered to sell the cotton subscribed to such Association, at any time six months after said blockade is removed."

The date of the Act shows that it was passed during the period of the war between the Confederate States, a portion of the United States, against the United States, and its reference to the blockade indicates its relation to it. The blockade was intended by the United States as an offensive measure against the Confederate States. The staple of the South was cotton, and to detain it within the limits of the Confederate States, so that it might not procure the sinews of war, of which the Confederate States stood in need, was an object of great importance to the United States. The operation of the blockade was as aggressive or offensive against the interests of the Confederate States as the onward march of the United States armies, or the destruction of the armies and cities of the Confederate States. To counteract the effects of the blockade was a *defensive* policy of the Confederate States, which they instituted in divers ways. They established numerous lines of blockade runners, sought the intervention of foreign nations to raise the blockade, and took other steps to avert its operations.

The nature of the Act of 1861, and its wording, indicates that it was intended as a portion of this defensive policy. The cotton being rendered useless, because of its being shut up on the plantations, could be rendered effective, by means of such associations as these predicating bills upon it, and issuing them, so that they might represent so much cotton, to be delivered six months after the blockade was raised. These bills, in a foreign market, it was supposed, would be sought after on account of their superior security ; and,

after getting into the pockets of the foreign holders, would plead very earnestly for the speedy removal of the blockade. They were the invisible spirits which could pass safely beneath the guns of the Federal cruisers, and animate intervention.

The proviso of Section 2 of the Act indicates that, when the blockade is raised, the necessity of the Act of 1861 shall have passed away; and Section 4 appears to be a rainbow of hope to a world famished for cotton, shewing the time and place when their wants could be satisfied.

Regarding the Act in its internal relation in establishing a currency within the Confederate States, it must, also, be considered as a defensive policy against the war. It is true that the Supreme Court of the United States, in the aforenamed case of *Texas* vs. *White*, does not attempt any exact definitions within which the acts of such a State Government (as that of South Carolina in 1861) must be treated as valid, or invalid. But, at the same time, it indicates that the Act of the State of Texas, in issuing the bonds in question, " was treasonable." Treason, therefore, may be taken as one of the complexions of a void Act. Foster, in his " Treatise," says: " Furnishing rebels, or enemies, money, arms, ammunition, or other necessaries, will, *prima facie*, make a man a traitor." And on page 427, Vol. 3, of *The United States* vs. *Aaron Burr*, the distinguished Chief Justice says: ·· If, for example, an army should be actually raised for the avowed purpose of carrying on open war against the United States, and subverting their government, the point must be weighed very deliberately before a Judge would venture to decide that an overt act of levying war had not been committed by a commissary of purchases who never saw the army, but who, knowing its object, and leaguing himself with the rebels, supplied that army with provisions." If this be so, how much more treasonable is the act of making and securing the currency than that of merely disbursing it.

In the case of *Evans et al.* vs. *City of Richmond*, Chief Justice Chase has taken clearer ground than the opinion of the Supreme Court : " This was an action to recover the amount of certain small notes issued by the city of Richmond, in April, 1861, in violation of the charter of the city, but which were afterwards legalized by the General Assembly of Virginia." The Court said : " These notes, when they were first issued, were void ; whatever validity they can claim must be under the Act of the Legislature in 1861. The Supreme Court, in the case of *Texas* vs. *White*, decided that

the Acts of the State Governments in the South, during the war, were only to be recognized when they were for the purpose of regulating private rights, such as marriage, descent, distribution of property, and such like cases. But whenever these Governments—which are undoubtedly to be considered Governments *de facto* as to the territory of the States, whose capital they occupied, and over whose territory they claimed and exercised dominion—have done acts tending to support the rebellion against the United States, then no such acts, nor any consequences from them, are to be recognized by this Court. The Act of 1861, by the Legislature of Virginia, appearing clearly to be an Act in aid of the rebellion, could confer no right which can be recognized by this Court. The notes in question being, therefore, originally void, cannot be recognized by this Court. Judgment for the defendant."

The effect of President Johnson's proclamation, of the 25th of December, 1868, proclaiming a universal pardon, has produced much controversy with reference to the question. If the Act of 1861 is void, the incorporated company may be resolved into a copartnership, the individuals of which, being cleansed of all guilt by the proclamation, their acts may become binding and obligatory. Without the aid of argument, however, I am unwilling to change the course matters have taken. It is true that Judge Trigg, from the United States Circuit Court, in the Eastern District of Tennessee, has held, in the case of the *United States* vs. 1500 *bales of cotton*, which had been purchased and used in furtherance of the rebellion, that the impurity was washed away by the proclamation of December 25, 1868. But a distinction may be drawn between executed and executory contracts. The Pope may grant absolution as to past offences, but his power to grant indulgences, to complete an act illegally commenced, is very questionable.

In making this decree, so contrary to my own past feelings, I am assured, by the names of the defendants who have taken the ground above indicated, of a returning sense of allegiance to the Government, and an appreciation of our misfortunes. I hope it may prove a lesson to us that we may never forget.

It is, therefore, ordered and decreed, that the demurrer be sustained and the bill dismissed.

The plaintiffs appealed, and now moved this Court to reverse the decree, on the grounds:

1. Because the Act of Assembly, under which the defendants organized and issued the bills referred to in the pleadings, was not in aid of the rebellion, but simply an Act to enable the planters to raise supplies upon their cotton, which they could not send forward to market during the existence of the blockade.

2. Because, from the case made, the demurrer ought to have been overruled, and the defendants should have been required to make good their engagements, as they had ample means to do, still in the hands of the corporators.

3. Because the decree is not sustained by the law of the land, or by the principles of equity.

*Bobo,* for appellant.

*Wallace,* contra.

March 23, 1870. The opinion of the Court was delivered by

MOSES, C. J. If the Act of December 21, 1861, referred to in the pleadings, was passed "for the purpose of giving aid and assistance and support to the war then waged by the State of South Carolina, in conjunction with other States, against the authority of the United States," as is submitted by the demurrer, it is incapable of conferring rights, because invalid and void.

At the time of its passage, the State was in armed hostility to the Union, with which it had severed its connection, so far as such a result could be effected by its own action, or that of the States with which it had confederated. War existed between the States so combined and the Federal authorities. The design, on the one hand, was the establishment of a new Government, to be formed from and by a portion of the old, and the purpose of the other was to prevent a dissolution of the Union, by the attempted withdrawal of either one or more of the States.

Legislation was exercised by such of the States so endeavoring to secede, except where the occupation of a superior and controlling Federal force offered opportunity to prevent it. The governments existing in the said States were so far "actual" and sufficient as to give validity to all laws they might prescribe for the regulation of their internal relations, provided these were not extended or used to aid, in any way, the war then waged against the United States. They were thus competent (in the language of Chief Justice Chase, in *The State of Texas* vs. *White,* 7 Wallace, 733,) "to do all that was necessary to peace and good order among citizens," and to en-

force obedience to their mandates, where these were not inconsistent with the duty and allegiance of their inhabitants to the Federal Government. The enactment of all laws intended for the advancement of the social, moral or industrial relations of the people of the State, unconnected with the objects of the war, would be recognized as within the competency of their Legislatures. While the States so combined against the Government were exerting their energies to forward the common cause in which they were engaged, still each had a duty to perform to its own citizens, separate and distinct from the obligation which bound it to contribute, in every possible way, to the success of the war.

As these States were of the parties thus arrayed against the United States, it might be said that, in one sense, the acts of the various departments of each of them must be understood and received as having a direct view to the establishment of the new Government, of which each was to be a portion. That, having the opportunity to legislate, and the means of enforcing their action, all enactments which lightened the burthens of the people, by developing new resources, and all improvements, by which labor was reduced and its application made more remunerative, contributed to strengthen their condition, and, thereby, better afforded them the means of contributing effectual assistance to the war, by increasing their own powers of endurance.

This, in our view, is not the character of the legislation which is void, because in aid of the war. To render it objectionable for such reason, it should, in itself, provide some resource, the tendency of which would, directly or indirectly, extend to the Government in whose interest it was acting a facility of means by which its ability to carry on the war would be increased. The extent of the aid would not vary the application of the principle—it might be of greater or lesser value or degree, but still it must be something definite, which could be seen or understood, and not left to be elicited by wild conjecture, or implied from circumstances forced into connection.

In the case of *Texas* vs. *White*, so much relied on in the argument here, the facts out of which the question there arose may be concisely stated in the following language, extracted from the opinion : "The insurgent Legislature of Texas organized a military board, and authorized that board to provide for the defence of the State, by means of any bonds in the Treasury, to the extent of a million of dollars. The defence contemplated by the Act was to

be made against the United States, by war.  Under this authority, the bonds in question were used in payment of cotton cards and medicines."  The very face of the Act thus carried on it the evidence of the purpose to which the bonds were to be appropriated, and rendered unnecessary any enquiry whether the particular articles purchased were intended to contribute to the defence of the State. The bonds furnished the means of the purchase, and were thus appropriated, with the design of carrying out the end proposed by the Act conferring the authority so to use them.

In the absence of an explicit declaration in the Act, (under consideration here,) that its purpose was to aid the war against the United States, the intention of the Legislature must be ascertained by a resort to the general rules by which statutes are construed. There is no difficulty as to what the Legislature proposed to be done, or accomplished, by the language which it has used.  No doubt arises, under any Section of the Act, as to its meaning.  It is rather, if not entirely, a question as to the motive which prompted the Legislature to its passage, and the end which they designed to accomplish by the enactment itself.  To ascertain these, regard may be had to the condition of the State at the time, and the circumstances by which it was surrounded.  On these points history may speak, but no testimony can be admitted to prove what was in the mind of the Legislature.  It must be derived from the Act, either by the intent being apparent on it, or it must arise from an implication so strong as to be irresistible.

The Act in question is entitled "An Act to charter a Cotton Planters' Loan Association," and was passed on 21st of December, 1861.—13 Stat., 45.

It did not announce, in mandatory terms, a new rule of conduct, to which the people were to yield obedience, or demand the performance of some duty or obligation on their part; but it afforded an opportunity to the citizens of each Congressional District to establish themselves into a chartered association, the principal privilege of which was to issue bills or notes on a capital of cotton subscribed, (and insured,) at a rate not to exceed the amount of six dollars for every hundred pounds of short, and fifteen dollars for every hundred pounds of long cotton ginned and baled, to discount bills of exchange, on their own issue, at a rate of interest not to exceed six per cent. per annum.

The charters were to continue till January, 1865.  The bills were to be redeemed in gold, six months after the removal of the block-

ade from the coast; and authority was given to sell the cotton sub-scribed at any time after the expiration of six months from such removal.

From this reference to the blockade, and the fact that the bills to be issued by the said companies were receivable in payment of taxes and other dues to the State, and, also, of the war tax of the Confederate States, of which the State had assumed the payment of the proportion to be met by its people—provided that, as to this last, it should be first made a condition that the same currency should be received in satisfaction of the amount which the State had ordered to be borrowed, to meet the tax so assumed—it is sub-mitted that the apparent purpose of the Act was to raise money in aid of the war, and that it was intended as a measure to that end.

The inference does not seem to be the only one which may be legitimately drawn, and the Act must be sustained, unless the ob-jection thus urged against it is so overruling as to resist every other conclusion. The cotton was not to be sold until six months after the removal of the blockade; and, as the issue of the corporations was not to be redeemed until the same time, the cotton was looked to as the medium through which the coin necessary for the redemp-tion was to be raised. So far from the Act affording facilities for the exportation of the cotton, (which was, in fact, the capital created by the charter,) in spite of the blockade, it was to be retained until the opportunity of free access to foreign markets should be afforded. It would be an imputation of absurdity against the Legislature, to suppose that they believed or expected that the bills of these local institutions—at the time, probably, not known, even by name, beyond the State—would be recognized in the banking marts of Europe as a safe medium of exchange, through which materials necessary for the war could be furnished and imported.

It is said, too, that they were receivable for taxes, and other pub-lic dues to the State, and that this attached to them a value which encouraged and promoted their circulation. But in what respect did this aid the State in carrying on the war? Confederate notes were also receivable for taxes and public dues. They constituted the only currency in circulation; they emanated from the very government which had control of the conduct of the war. It was the paper which the Confederate Government had an interest in sustaining. If the introduction of the notes of these companies was calculated to depreciate the national currency, (so to call it,) such abstraction of value certainly weakened the very and only

currency on which the Confederate Government relied for its own support.

It is said, too, that, as these notes were receivable by the State in payment of the war tax levied on the people by the Congress of the Confederate States, and assumed by the State, so far as the same was to be collected from its citizens, there was an appropriation of them, by the State, to a measure clearly in aid of the war. The State, for the payment so to be made, was to be reimbursed by the collection of the said tax through its own officers, and for its use, and it received, as a consideration of the assumption, ten per cent., of which its own treasury had the benefit—thus really diminishing the quota of taxes which otherwise would have passed from the State into the hands of the Confederate Government. To raise the required amount, the State was forced to borrow, and the receipt of the notes of these Associations in payment of the said war tax, so assumed, was on condition that they should be received in payment of the loan. This condition, thus demanded by the State, so far from shewing that the notes were regarded as of greater value than Confederate currency, would imply that they were not held in as high estimation, for the purpose of exchange or otherwise, or the preference would have been to retain them rather than to secure a mode for their disposal.

We may be permitted to look to the Act to extend and alter the charter of *this* very association, passed on the 23d December, 1864. —13 Stat., 256. It may, by reflection back, serve to show that the design of the Act so extended, while it may have been induced by a desire to make the cotton held by the people available, not only as a source of profit, but as the means of raising money for their present uses, without a sacrifice of the commodity itself, was not intended in aid of the war.

The charter was within a few days of its expiration. The blockade still existed. All the rights and powers conferred by the original charter were again vested in the company, except that its stock was not to be increased, and it was forbidden to issue or reissue any notes, and the necessity of keeping the cotton insured was removed. With these changes, its charter was extended to January, 1869. It could scarcely have been anticipated, in December, 1864, that the war would continue until 1869. The superior force brought by the Federal arms to bear on the Confederacy—the suffering and privation to which the people at home had been subjected—must, at that date, have impressed every impartial mind with the conviction

Morgan *vs.* Keenan.          .

that the war could not be of much longer duration. With the termination of it, the one way or the other, the blockade would necessarily cease. With all this in view, the company, which, it is averred, was established to counteract, if possible, the effects of the blockade, had an extension to a period before which, in all probability, it would cease to exist. If the Act passed in 1861 was intended to aid the war, it might appear a little remarkable that, when the charter was before the Legislature, in 1864, for extension, the changed condition of the country, resulting from the war, did not require and demand any alterations in its terms, to make its employment more useful and certain for the purpose for which it is said it was originally designed.

It cannot be successfully maintained that every Act of the Legislature during the war, the tendency of which was to offer to the people the probable opportunity of better investments for the proceeds of their labor, or the means by which it could be lessened and their gains therefor not decreased, or to improve their moral or pecuniary condition, must necessarily be construed to be in-aid of their resistance of the Government of the United States. Carried to the extent claimed by the argument, the Legislature, in the actual exercise of its functions, would have been powerless to do anything which might contribute to the promotion of the interest of the people or the State.

No other question arising in the cause has been considered by this Court but that raised by the demurrer, which is the only one brought up by the appeal.

It is ordered and adjudged, that the order of the Judge below, sustaining the demurrer, be reversed, and that the case be remanded to the Circuit Court of Union County for hearing.

*Willard,* A. J., concurred.